**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| ROBERT ALAN LUTHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3-15-cv-00601 |
| v. | ) | Senior Judge Haynes |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## M E M O R A N D U M

Plaintiff, Robert Alan Luther, filed this action under 42 U.S.C. § 405(g) against the

Defendant, Carolyn Colvin, Acting Commissioner of Social Security, seeking judicial review of the

Commissioner's denial of his application for Disability Insurance Benefits ("DIB") under Title II of

the Social Security Act.

Before the Court is Plaintiff's motion for judgment on the record (Docket Entry No. 18), to

which the Commissioner filed her response (Docket Entry No. 20). In his motion, Plaintiff contends

that the Court should remand because: (1) the Appeals Council failed to find that a medical source

statement was "new and material" evidence requiring reconsideration by the Administrative Law

Judge ("ALJ"); (2) the ALJ relied on insufficient vocational expert testimony; and (3) the ALJ

incorrectly found that Plaintiff's mental impairments were "non-severe" during periods of sobriety

and thus failed to incorporate mental limitations in Plaintiff's residual functional capacity ("RFC")

assessment.

Plaintiff's application for DIB initially was denied on September 10, 2013, and after

reconsideration on March 12, 2014. (Docket Entry No. 14, Administrative Record, at 150-53, 157-

58).[1] Plaintiff filed a timely written request for a hearing before an ALJ and after a hearing the ALJ

denied Plaintiff's claims, based upon the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2014.

2.  The claimant has not engaged in substantial gainful activity since April 15, 2010, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.  The claimant has the following severe combination of mental impairments: anxiety, depression, and alcohol dependence (20 CFR 404.1520(c)). He also has several severe physical impairments discussed below in paragraph 5.

4.  The claimant's impairments, including the substance use disorder, meet sections 12.04, 12.06, and 12.09 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d)).

5.  If the claimant stopped the substance use, the remaining limitations would not cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would not continue to have a severe mental impairment. The claimant would continue to have severe physical impairments of degenerative joint disease of the left shoulder, osteoarthritis/degenerative joint disease of the knees, seizure disorder, low back pain of uncertain etiology and left hand carpal tunnel syndrome, as discussed in finding 7 below.

6.  If the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d)).

7.  If the claimant stopped the substance use, the claimant would have the residual functional capacity to lift and/or carry no more than 20 pounds; frequently lift and/or carry no more than a total of ten pounds; can stand/walk for a total of about six hours in an eight hour workday; sit for a total of about six hours in an eight hour workday; only occasional use of the non-dominant left upper extremity in terms of feeling, fingering, handling and reaching and could do no pushing/pulling with the left upper extremity; any pushing/pulling would have to be with the dominant right upper extremity

---

[1]The Court's citations are to the pagination in the Administrative Record, not in the electronic case filing system.

only; can frequently balance; should never climb ladders, ropes or scaffolds; can do no more than occasional bending at the waist; occasionally climb stairs and ramps; can occasionally kneel and crawl; can never do any overhead reaching with the non-dominant left upper extremity; can only occasionally reach in other directions with the non-dominant left upper extremity; must avoid working at unprotected heights, working with and operating moving mechanical parts; and must avoid operating commercial motor vehicles.

8.  If the claimant stopped the substance use, the claimant would be unable to perform past relevant work (20 CFR 404.1565).

9.  The claimant was born on October 5, 1961 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

10. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

11. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

12. Is the claimant stopped the substance use, considering the claimant's age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the claimant could perform (20 CFR 404.1560(c) and 404.1566).

13. The claimant's alcoholism is a contributing factor material to the determination of disability because the claimant would not be disabled if he stopped the substance use (20 CFR 404.1520(g) and 404.1535). Because the substance use disorder is a contributing factor material to the determination of disability, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.

Id. at 16-27. Plaintiff filed a request for review of the ALJ's decision with the Appeals Council that was denied. Id. at 1-4. The Appeals Council's denial rendered the ALJ's decision the Commissioner's final decision. Id. at 1.

## A. Review of the Record

Plaintiff is fifty-four years old, graduated high school, and completed some college course work without obtaining a college degree. Id. at 68. Plaintiff alleges an onset date of April 15, 2010. Id. at 223.

On April 21, 2010, Plaintiff was admitted to Skyline Medical Center ("Skyline") for stabilization of symptoms associated with alcohol dependence and depression following an overdose on "13 Librium and a pint of vodka." Id. at 351, 379. Plaintiff complained of left shoulder pain and "lower to midepigastric" discomfort eating and swallowing. Id. at 379. Plaintiff previously had surgery on his left shoulder and was "found to have torn biceps tendon and a torn labrum in his left shoulder." Id. at 420. Dr. George Mathews conducted a psychiatric evaluation of Plaintiff and noted that Plaintiff reported he was "no longer suicidal." Id. at 420. Dr. Mathews noted that Plaintiff had been drinking "a pint or 2 of vodka" and "previously detoxified several times at Baptist Medical Center," but that Plaintiff "had periods of sobriety lasting up to 18 months in the past." Id. at 420-21. Dr. Mathews also noted that Plaintiff did not have any seizures the prior two years and that "some of [Plaintiff's previous] seizures were associated with alcohol withdrawal." Id. at 420. On April 24, Plaintiff was discharged with diagnoses of "major depressive disorder, recurrent, severe without psychotic features," alcohol dependence, history of seizure disorder, left shoulder pain, hypertension, esophagitis, hyponatremia, and "severe psychosocial stressors with housing problems, relational problems, marital problems, and occupational problems." Id. at 351.

On April 28, 2010, Plaintiff visited Dr. Blake Garside of the Tennessee Orthopaedic Alliance ("TOA") to follow up on his left shoulder surgery. Id. at 299. Dr. Garside restricted Plaintiff to "no overhead work or lifting" but stated that Plaintiff could "resume regular duties and activities" on

May 17, 2010. Id.

On May 7, 2010, Plaintiff was admitted to ("Baptist") for acute alcohol detoxification and complained of feeling depressed. Id. at 1046, 1057, 1060. Plaintiff had been drinking heavily since losing his job four days before. Id. at 1046, 1060. Dr. John Gibson noted that Plaintiff had "severe alcohol addiction" and "numerous attempts at rehabilitation as well as multiple hospitalizations recently with acute alcohol intoxication following binge drinking . . . ." Id. at 1046. On May 10, Plaintiff was discharged as stable with diagnoses of acute alcohol intoxication, partial complex seizures, and hypertension. Id. at 1041-42.

On May 15, 2010, Plaintiff presented to Skyline complaining of "right hand pain secondary to a fall sustained with 3-4 sutures in place." Id. at 377. Plaintiff was "requesting hospitalization and alcohol withdrawal after drinking heavily . . . ." Id. at 418. Dr. Mathews performed a psychiatric evaluation and noted that Plaintiff "seems to have poor coping skills, dealing with his current stressors" that included separating from his wife and losing his job, shelter, and sponsor. Id. 417-18. On May 20, Plaintiff's sutures were removed and he was discharged as stable to a halfway house. Id. at 349. At discharge, Plaintiff had diagnoses of severe alcohol dependence, history of major depression, history of seizure disorder, hypertension, right hand contusion, and right fourth digit laceration. Id. at 348.

On June 11, 2010, Plaintiff returned to Dr. Garside of the TOA to follow up on his left shoulder surgery. Id. at 304. Dr. Garside noted that Plaintiff had "some intermittent discomfort especially when trying to pour things or lift things repetitively in an outstretched position." Id. Dr. Garside opined that Plaintiff had reached "maximum medical improvement." Id.

On June 21, 2010, Plaintiff was taken to Baptist after he was found extremely intoxicated

lying on the sidewalk in front of a business. Id. at 1021. Plaintiff had been "consuming vodka in large quantities for a number of days," was "quite despondent," and had "contemplated suicide by jumping off a bridge." Id. at 1007. Dr. Gibson was "not sure whether [Plaintiff] truly ha[d] serious suicidal ideation" and Plaintiff's review of symptoms was "essentially negative except for the positive alcohol blackouts." Id. Plaintiff was discharged on June 22. Id. at 1006.

On July 5, 2010, Plaintiff was admitted to Skyline for stabilization of symptoms associated with alcohol dependence and depression. Id. at 375. Plaintiff was stable but complained of abdominal pain. Id. at 375-76. Plaintiff "reported having suicidal ideations, but without a specific plan." Id. at 345-46. Dr. Mathews noted that Plaintiff had been drinking "a fifth of a gallon of vodka a day." Id. at 414. On July 10, 2010, Plaintiff was discharged as stable with diagnoses of "alcohol dependence, major depressive disorder, recurrent, severe, without psychotic features," shoulder pain, hyponatremia, elevated liver enzymes, alcoholic liver disease, "history of seizures, withdrawal related," uncontrolled hypertension, and abdominal pain. Id. at 345-46.

On July 19, 2010, Plaintiff was admitted to Baptist with acute alcohol intoxication. Id. at 986. Dr. Gibson noted that Plaintiff had been "binge drinking for a considerable number of days." Id. Plaintiff was treated and discharged on June 21. Id. at 986-87.

On July 23, 2010, Dr. Garside of the TOA evaluated Plaintiff's level of impairment following his left shoulder surgery and found that Plaintiff had "5% upper extremity impairment" that was "equivalent to 3% whole person." Id. at 303.

On July 25, 2010, Plaintiff presented to Baptist with syncope after passing out while in the heat. Id. at 971, 973. Plaintiff was discharged as stable that same day. Id. at 963.

On August 5, 2010, Plaintiff was admitted to Skyline for stabilization of symptoms

6

associated with alcohol dependence and depression. Id. at 374. Plaintiff complained of feeling tremulous with an "aura as if he [was] about to have a seizure." Id. Plaintiff also complained of back, shoulder, and leg soreness. Id. at 412. Dr. Mathews noted that Plaintiff had been drinking "more than a [fifth] of a gallon of liquor a day" and had a "history of withdrawal seizures." Id. On August 9, Plaintiff was discharged without any withdrawal symptoms with diagnoses of "alcohol dependence, dysthymic disorder," hypertension, epilepsy, "hepatitis, not otherwise specified," and tobacco use disorder. Id. at 342-43.

On August 16, 2010, Plaintiff presented to Baptist with syncope precipitated by heavy drinking and passing out. Id. at 935. Plaintiff's issues were intoxication and chronic alcoholism. Id. at 937. Plaintiff was discharged on August 17. Id.

On August 23, 2010, Plaintiff presented to Baptist with face, throat, and lip swelling. Id. at 900. Plaintiff complained of nausea, abdominal pain, and drooling, as well as difficulty breathing and swallowing. Id. Plaintiff had been "binge drinking" for three days the week before his hospitalization. Id. Plaintiff stated that he had a period of sobriety from July 2009 through January 2010. Id. Dr. Gibson noted that Plaintiff had "developed acute angioedema almost certainly related to his use of ACE inhibitor." Id. at 899. Plaintiff was discharged on August 24. Id.

On October 24, 2010, Plaintiff presented to Skyline for stabilization of symptoms associated with alcohol dependence and depression. Id. at 371. Plaintiff "complained of suicidal ideations with plans to jump off a bridge." Id. at 410. Plaintiff stated that he had been on a "drinking binge" for four days and had been "drinking about a fifth of a gallon of liquor a day recently." Id. Plaintiff also stated that he suffered a seizure "about a month ago." Id. On October 28, Plaintiff was discharged as stable with diagnoses of alcohol dependence, opiate abuse, "major depressive disorder, recurrent, severe

without psychotic features," hypertension, and withdrawal seizures. Id. at 339, 341.

On November 18, 2010, Plaintiff presented to Baptist after falling off of a ladder and hitting the back of his head. Id. at 881. Plaintiff had a three centimeter laceration on his scalp. Id. at 882. Plaintiff suffered moderate pain, bleeding, and swelling. Id. at 881. Plaintiff stated that he did not remember falling but was drinking alcohol while attempting to clean the walls. Id. at 876. A CT scan of Plaintiff's head reflected mild diffuse atrophy, no evidence of intracranial trauma, and small scalp hematoma overlying the left occipital bone without evidence of fracture. Id. at 887. Plaintiff was discharged that same day. Id. at 881. On November 27, Plaintiff returned to Baptist for staple removal and requested assistance with alcohol rehabilitation but was discharged escorted out for alcohol intoxication. Id. at 863-64.

On January 6, 2011, Plaintiff presented to Baptist complaining of mild back pain and left hand pain and swelling. Id. at 832, 839. Plaintiff stated that he was "severely intoxicated" the day before. Id. at 840. Medical imaging reflected that Plaintiff's left hand was not fractured or dislocated. Id. at 839. Plaintiff was discharged on January 8. Id.

On January 19, 2011, Plaintiff followed up on his hospitalization for hand swelling with Dr. Philip Coogan of the TOA. Id. at 298. Plaintiff stated that he had not drank any alcohol since his injury. Id. Dr. Coogan stated that Plaintiff had "resolving hand symptoms after compression injury to the arm." Id. Dr. Coogan opined that "the overall picture is probably consistent with hand swelling after [Plaintiff] slept on the hand for a prolonged period of time when he was extremely intoxicated." Id.

On January 25, 2011, Plaintiff presented to Baptist and stated that someone at his house called emergency medical services because he was drunk. Id. at 801. Plaintiff stated that he had been

8

drinking a pint of vodka per day and complained of left shoulder pain. Id. Plaintiff was discharged that same day. Id. at 802.

On January 28, 2011, Plaintiff returned to Dr. Garside of TOA complaining of left shoulder pain and loss of motion. Id. at 296. Plaintiff had "significantly decreased strength and active range of motion" since his last visit in June 2010. Id. Dr. Garside took three x-rays of Plaintiff left shoulder that revealed "no evidence of acute fractures or dislocations," though his "joint spaces [were] narrowed within the glenohumeral joint." Id. Dr. Garside opined that Plaintiff's "exam and history [were] most suggestive of a rotator cuff tear," and recommended a left shoulder MRI. Id.

On January 28, 2011, presented to Skyline complaining of body aches, chills, slight tremor, and left lower back pain. Id. at 395. Plaintiff stated that he was depressed and drinking "a fifth of vodka a day." Id. Dr. Gibson opined:

> I really don't know what else to offer in [Plaintiff's] treatment of alcoholism since [he] has failed just about every referral or suggestion I and social workers have provided him during his many hospitalizations for intoxication. I do think that if any of his alcohol consumption is driven by self medication for depression, the treatment of his depression may serve as a modest deterrent to drinking.

Id. On February 2, Plaintiff was discharged with diagnoses of alcohol dependence, dysthymic disorder, hypertension, history of seizures, and history of rotator cuff injury. Id. at 369.

On February 3, 2011, Plaintiff presented to the TOA for electrodiagnostic studies of his left upper extremity and complained of decreased sensation in his hand. Id. at 312. Dr. Christopher Ashley found evidence of "some denervation changes" and "moderate to severe median neuropathy which clinically correlates with carpal tunnel syndrome on the left side." Id. Dr. Coogan noted that Plaintiff had decreased pain and swelling, with improved sensibility and objectively improving sensory and motor function. Id. at 297.

On February 7, 2011, Dr. Stephen Quinn of the TOA performed an MRI on Plaintiff's left shoulder and did not identify a rotator cuff tear. Id. at 311. Dr. Quinn found moderate joint effusion of the glenohumeral joint and a possible tear of Plaintiff's posterior labrum. Id. On February 9, Dr. Garside examined Plaintiff and found that "the majority of his symptoms or present pain [were] secondary to a brachial plexopathy." Id. at 295. Dr. Garside released Plaintiff to "regular duties and activities." Id.

On February 20, 2011, Plaintiff presented to Baptist seeking alcohol detoxification services and stated that he had several seizures that day. Id. at 773. Plaintiff was given information regarding how and where to seek detox services and discharged in no distress. Id. at 771.

On February 22, 2011, Plaintiff was admitted to Skyline after passing out in his car from alcohol consumption. Id. at 366, 392. Plaintiff complained of increasing left shoulder pain since his left shoulder MRI and "withdrawal symptoms," including body aches and chills. Id. On February 26, Plaintiff was discharged with diagnoses of alcohol dependence, hypertension, history of seizure disorder, "shoulder pain, left shoulder, neuropathy, left shoulder weakness," and elevated liver enzymes. Id. at 366.

On March 13, 2011, Plaintiff presented to Baptist for alcohol detoxification after he arrived intoxicated to an "AA meeting." Id. at 756, 763. Plaintiff was discharged that same day. Id.

On March 30, 2011, Plaintiff visited Dr. Michael Kaminski of Tennessee Neurology Specialists ("TNS") for possible associated nerve injury. Id. at 321. Plaintiff complained of left shoulder pain, left hand numbness, and weakness in the arm and hand. Id. Dr. Kaminski examined Plaintiff and found "some residual restriction in lateral rotation and elevation of the left shoulder." Id. at 322. Dr. Kaminski concluded that Plaintiff's pain was "rather diffuse to reflect local cervical

root disease." Id. As to Plaintiff's numbness, Dr. Kaminski concluded that he had carpal tunnel syndrome but did "not appear to have brachial plexopathy." Id. at 323. An MRI of Plaintiff's cervical spine reflected "significant arthritis and disk disease in the midportion of [his] neck," resulting in spinal stenosis. Id. at 334, 336, 316.

On April 15, 2011, Plaintiff returned to Dr. Kaminski of TNS complaining of left shoulder pain and left hand numbness. Id. at 324. Dr. Kaminski reviewed the results of Plaintiff's cervical spine MRI with Plaintiff and found that Plaintiff had "some proximal [left] shoulder girdle weakness that [was] hard to localize." Id. at 325. Dr. Kaminski opined that Plaintiff "appear[ed] to have [left carpal tunnel syndrome]" and that "concurrent alcoholism and depression complicate[d] his evaluation and management." Id.

On April 21, 2011, Plaintiff visited TNS for an EMG that reflected "electrophysiological evidence of chronic . . . root pathology" and "moderately severe [left carpal tunnel syndrome] and mild [left] ulnar pathology at the elbow segment." Id. at 329.

On May 10, 2011, Plaintiff presented to Baptist requesting "alcohol detox" because he was scheduled to have neck surgery and a doctor told him that he needed to "detox" before surgery. Id. at 732. Plaintiff had a seizure that morning. Id. Plaintiff was discharged that same day. Id. at 730.

On May 14, 2011, Plaintiff arrived intoxicated to Skyline for his preoperative work-up, and was admitted for alcohol detoxification. Id. at 389. Plaintiff stated that he drank "a fifth of vodka a day for the last 2 months." Id. at 408. Plaintiff was "tremulous, unable to grip a pen, [with] difficulty feeding himself." Id. at 407. On May 19, Plaintiff was discharged with diagnoses of alcohol dependence, "major depressive disorder, recurrent, severe without psychotic features," seizure disorder, left arm radiculopathy per history, spinal stenosis per history, head injury at 17 years old,

hypertension, hyponatremia, thrombocytopenia, and elevated liver function test. Id. at 363.

On June 7, 2011, Plaintiff presented to Baptist requesting admission for alcohol detoxification. Id. at 716. Dr. Gibson stated that Plaintiff was "hospitalized for his and the public's safety because of his acute intoxicated state and the fact that he had been driving in this impaired state." Id. at 718. Plaintiff stated that he drank "a half-pint of vodka" that morning. Id. at 717. Plaintiff was discharged on June 8. Id. at 716.

On September 2, 2011, Plaintiff presented to Baptist with acute alcohol intoxication and stated that he drank "at least a pint of vodka before driving himself to the office." Id. at 696, 1270. On September 6, Plaintiff was discharged at stable with diagnoses of "acute alcoholic intoxication, resolved," alcohol withdrawal delirium, spinal stenosis, hypertension, and epilepsy. Id. at 692, 1279.

On February 11, 2012, Plaintiff presented to Baptist with a left eyebrow laceration suffering from pain, bleeding, and swelling. Id. at 675. Plaintiff had drank one pint of vodka and missed a step walking onto the porch. Id. Plaintiff received stitches and was discharged that same day. Id. at 669. On February 17, Plaintiff returned to Baptist for suture removal and was discharged. Id. at 659.

On May 30, 2012, Plaintiff presented to Baptist with acute alcohol intoxication. Id. at 628, 1268. Plaintiff reported having "a number of focal motor seizures." Id. On June 2, Plaintiff was discharged as stable with diagnoses of "acute alcoholic intoxication and alcoholism, continuous drinking behavior," "localization related focal partial epilepsy and epileptic syndrome with simple partial seizures," and essential hypertension. Id. at 625, 1283.

On July 19, 2012, Plaintiff was admitted to Skyline for psychiatric stabilization and alcohol detoxification, complaining of "increasing depression with serious suicidal ideations" that had "never gotten to that point before." Id. at 387. Plaintiff had been drinking "anywhere from a fifth or

more everyday." Id. at 361. On July 25, Plaintiff was discharged with diagnoses of "major depressive disorder, recurrent," alcohol dependence, hypertension, seizures, chronic low back pain, and cervical and lumbar stenosis. Id. at 360.

On September 26, 2012, Plaintiff was taken to Baptist after he experienced "severe anxiety with confusion and disorientation with visual and auditory hallucinations." Id. at 1274. Plaintiff stated that he ran out of his seizure medication four days before, and experienced several focal motor seizures over the previous three days. Id. at 598, 1274. A CT scan of Plaintiff's head was negative and a chest x-ray reflected "questionable atelectasis or infiltrate in a patchy pattern in the right basilar area." Id. at 1274-75. Plaintiff stated that he had not consumed alcohol in one month. Id. at 587. Plaintiff was discharged on September 28. Id.

On October 6, 2012, Plaintiff was admitted to Skyline for psychiatric stabilization and alcohol detoxification, complaining of body aches, mild constipation, and chronic neck and back pain. Id. at 384. Plaintiff stated that he "drank a fifth of vodka yesterday morning while at work." Id. at 401. On October 11, Plaintiff was discharged with diagnoses of alcohol dependence, alcohol withdrawal, "major depressive disorder, recurrent, severe without psychotic features," epilepsy, hypertension, spinal stenosis of lumbar and cervical disk, bulging disk, chronic pain, tachycardia, hyponatremia, and constipation. Id. at 357.

On October 17, 2012, Plaintiff presented to Baptist with an "altered mental state." Id. at 559. A bystander had observed Plaintiff suddenly become confused and brought him to the emergency department. Id. at 566. Plaintiff did not have any facial droop but had slurred speech. Id. Plaintiff stated that he had been drinking vodka that day. Id. A CT scan of Plaintiff's head was negative. Id. at 572. Plaintiff was discharged that same day. Id. at 551.

On November 1, 2012, Plaintiff presented to Skyline with suicidal ideations having recently relapsed on alcohol, and complained of nausea, shakes, and fears of having seizures. Id. at 381, 399. Plaintiff stated that he had been drinking "up to a half gallon of vodka a day." Id. at 399. On November 7, Plaintiff was discharged with diagnoses of alcohol dependence, "depressive disorder, not otherwise specified, rule out substance induced depression," hypertension, history of spinal stenosis, history of potentially alcohol induced seizures, chronic pain, abnormal liver function tests, and back pain. Id. at 354.

On February 17, 2013, Plaintiff presented to Baptist complaining of alcohol withdrawal and seizures the last several days. Id. at 499. Plaintiff stated that he had been out of his seizure medication for "awhile". Id. Plaintiff also stated that he "usually drinks a pint of vodka a day and has some beers." Id. at 499. On February 20, Plaintiff was discharged as stable with diagnoses of "acute alcoholic intoxication and alcoholism, continuous drinking behavior," "localization-related focal partial epilepsy and epileptic syndrome with simple partial seizures," hypernatremia, essential hypertension, polycythemia, and anxiety. Id. at 496.

On a May 8, 2013, disability report, Plaintiff described his inability to work as due to epilepsy, arthritis in his spine and hips, spinal stenosis, chronic pain, difficulty sleeping, bulging back disc, screw in his left shoulder, and left arm pain. Id. at 227.

On June 3, 2013, Plaintiff presented to Nashville Medical Group with swelling in both feet and ankles. Id. at 1256. An office note reflects that Plaintiff "quit drinking in 2013." Id. at 1262. Medical imaging reflected "no evidence of venous thrombosis of the lower extremities." Id. at 1287.

On a June 14, 2013, seizure questionnaire, Plaintiff stated that his last seizures were on May 29 and 31. Id. at 234. Plaintiff stated that the frequency of his seizures varied from daily, to every

two-to-three weeks, to every two-to-three months. Id.

On a June 14, 2013, function report, Plaintiff stated that he had short term memory loss and could neither bend, lift, or raise his left arm over his head, nor sit or stand in one place for an extended period. Id. at 236. Plaintiff stated that his chronic severe alcoholism limited his ability to go to work and maintain a job. Id. Plaintiff checked boxes listing limitations in his ability to lift, squat, bend, stand, reach, walk, sit, kneel, hear, climb stairs, see, remember, complete tasks, concentrate, follow instructions, use his hands, and get along with others. Id. at 241. Plaintiff noted that his back pain negatively affected his sleep, and that he experienced pain when dressing, bathing, and using the toilet. Id. at 237. Plaintiff stated that he needed reminders for personal needs and taking medicine. Id. at 238. Plaintiff also stated that he could prepare simple meals, do light housework, leave the house alone, and grocery shop, though he could not make decisions regarding money. Id. at 239.

On August 7, 2013, Plaintiff visited Dr. Robert Doran for a psychological evaluation as part of the disability determination. Id. at 1210. After reviewing Plaintiff's social security application and conducting a clinical interview, Dr. Doran diagnosed Plaintiff with: alcohol dependence, early full remission, by report, and anxiety disorder. Id. at 1212. Plaintiff told Dr. Doran that he had not consumed alcohol for approximately two months. Id. at 1211. Dr. Doran found that Plaintiff had mild limitations in understanding and remembering, sustaining concentration and persistence, interacting with others, and adapting to changes. Id. at 1212. Dr. Doran also found that Plaintiff was capable of managing funds as long as he did not relapse on alcohol. Id. Dr. Doran opined, "the relationship between [Plaintiff's] reported alcohol dependence, anxiety, and depression appears undifferentiated at this time." Id.

On an August 20, 2013, medical source statement, Dr. Doran checked "no" next to the question "is ability to understand, remember, and carry out instructions affected by the impairment?" Id. at 1214. Dr. Doran also checked boxes reflecting that Plaintiff was mildly limited in the following areas: understand and remember simple instructions; carry out simple instructions; ability to make judgments on simple work-related decisions; understand and remember complex instructions; carry out complex instructions; and ability to make judgments on complex work-related decisions. Id. Dr. Doran checked "no" next to the question "is ability to interact appropriately with supervision, co-workers, and the public, as well as respond to changes in the routine work setting, affected by impairments?" Id. at 1215. Dr. Doran also checked boxes reflecting that Plaintiff was mildly limited in the following areas: interact appropriately with the public; interact appropriately with supervision(s); interact appropriately with co-workers; and respond appropriately to usual work situations and to changes in a routine work setting. Id.

On August 23, 2013, psychological consultant Dr. Fawz Schoup reviewed Plaintiff's records and found that Plaintiff had the following severe impairments: degenerative disc disease, osteoathrosis, major joint dysfunction, anxiety disorder, and alcohol addiction. Id. at 122-23. Dr. Schoup found that Plaintiff had moderate restrictions in activities of daily living, mild difficulties in maintaining social functioning and maintaining concentration, persistence or pace, and insufficient evidence to make a determination regarding episodes of decompensation. Id. at 123. Dr. Schoup gave "significant weight" to Dr. Doran's evaluation because it was "the only mental assessment absent" alcohol, but found that Plaintiff's history suggested "somewhat greater adaptive limitations" than found by Dr. Doran. Id. at 124. Dr. Schoup found that Plaintiff had moderate limitations in his ability to respond appropriately to changes in the work setting and his ability to set realistic goals or make

pans independently of others. Id. at 128. Dr. Schoup opined that Plaintiff could "adapt to gradual change and set limited goals." Id.

On September 17, 2013, Plaintiff completed a disability report on appeal, stating that his condition deteriorated since May 2013 due to his conditions gradually becoming more severe and causing him greater problems. Id. at 250. Plaintiff stated that this deterioration affected "virtually every aspect of [his] day and everything that [he did]." Id. at 253.

On an October 15, 2013, function report, Plaintiff stated that he could not sit, stand, or walk for extended periods without experiencing severe back, neck, and left shoulder pain. Id. at 255. Plaintiff noted that his pain fluctuates depending on the day. Id. at 256. Plaintiff stated that he needed assistance getting up and could not bend, climb ladders, or lift overhead. Id. at 255, 261. As to social activities, Plaintiff stated that he had daily telephone conversations with friends and attended meetings for his alcoholism twice a week when available. Id. at 259. Plaintiff checked boxes listing limitations in his ability to understand, in addition to the areas listed on his June 14 function report. Id. at 260.

On November 8, 2013, Plaintiff presented to Nashville Medical Group for counseling regarding his diet and complained of joint pain, weight gain, and ankle swelling. Id. at 1259-60. Plaintiff stated that he had "not had a drink since June." Id. at 1259.

From November 26, 2013, through December 30, 2013, Plaintiff attended eight physical therapy sessions for his lower back pain. Id. at 1222-41. At Plaintiff's last session, office notes reflect that Plaintiff was "progressing well and report[ing] a decrease in overall pain." Id. at 1223. Yet, Plaintiff "continue[d] to have pain daily, decreased lumbar [range of motion] which impairs [activities of daily living] such as reaching to floor, tying shoes, etc." Id. at 1223-24. The physical

therapist recommended continued physical therapy "to decrease pain and facilitate increased participation in" activities of daily living. Id. at 1224.

On March 12, 2014, psychological consultant Dr. Eran Stanley reviewed Plaintiff's records as part of his request for reconsideration and agreed with Dr. Schoup's August 2013 assessment. Id. at 138-44.

On March 18, 2014, Plaintiff completed a disability report on appeal, stating that his condition deteriorated since September 2013 due to his conditions gradually becoming more severe and causing him greater problems. Id. at 265. Plaintiff stated that he was more limited in "virtually every aspect of [his] daily life." Id.

On April 30, 2014, Plaintiff visited Dr. Phillips of the TOA complaining of decreased function in both knees, including difficulty going up or down stairs. Id. at 1242. Dr. Phillips obtained x-rays of both knees and found "some minimal calcification of the menisci but with joint spaces reasonably maintained." Id. Dr. Phillips concluded that the x-rays did not "demonstrate significant degenerative change." Id. Based on Plaintiff's complaints, Dr. Phillips recommended that Plaintiff get an MRI of each knee. Id. at 1243-44.

On June 30, 2014, Plaintiff presented to Saint Thomas Physician Services ("STPS") complaining of muscle aches, muscle weakness, joint pain, back pain, and swelling in his extremities. Id. at 1374. Plaintiff was assessed with anxiety. Id. On July 15, Plaintiff returned to STPS for treatment of his depression. Id. at 1369. Plaintiff stated that he had been sober for two years and that he "continue[d] to have mini seizures" that caused him significant anxiety. Id. Plaintiff was assessed with history of alcoholism, moderate recurrent major depression, and posttraumatic stress disorder. Id. at 1371. On August 21, Plaintiff returned to STPS for treatment related to his

previously assessed psychological issues. Id. at 1365-68. On September 30, Plaintiff returned to STPS complaining of joint and knee pain. Id. at 1363. Plaintiff reported that he had been drinking alcohol that day, and was assessed with alcoholism. Id. at 1363-64.

On October 2, 2014, Plaintiff was admitted to Skyline for "increasing alcohol use, noncompliance with seizure medications and worsening depression." Id. at 1311. Plaintiff stated that he had been drinking "2 pints of vodka daily." Id. at 1306, 1311. Plaintiff reported that he was arrested after calling police to remove his daughter and her boyfriend from the house where he was staying. Id. at 1307. Plaintiff stated that he spent a week in jail and was released on September 9. Id. The day he was released from jail, Plaintiff's wife served him with divorce papers. Id. On October 8, Plaintiff was discharged and referred to a halfway house with diagnoses of alcohol dependence, alcohol induced depression, partner relationship problem, seizure disorder, hypertension, obesity, history of spinal stenosis with chronic back and knee pain, elevated creatine kinase without obvious rhabdomyolysis, and osteoarthritis. Id. at 1306, 1309.

On October 21, 2014, Plaintiff returned to STPS for treatment related to his previously assessed psychological issues. Id. at 1358. Office notes reflect that Plaintiff "minimize[d]" his relapse on alcohol and arrest. Id. at 1360. Plaintiff stated that he was having "excessive mood swings" and "problems functioning [] every day and living in a half way house." Id. at 1361.

On October 23, 2014, Plaintiff returned to Dr. Phillips of the TOA complaining of knee stiffness with inactivity and greater symptoms in the left knee after going down steps. Id. at 1336. Dr. Phillips reviewed MRIs of Plaintiff's knees obtained October 18 and concluded that Plaintiff had "anterior horn lateral meniscal tears." Id. Dr. Phillips administered an injection in both of Plaintiff's knees to attempt to treat Plaintiff's symptoms. Id.

On November 4, 2014, Plaintiff returned to STPS for treatment related to his previously assessed psychological issues. Id. at 1351. Plaintiff stated that he was sober and had not experienced seizures since he stopped drinking alcohol again. Id. Office notes reflect that Plaintiff's "left upper abdominal/flank discomfort [was] nonspecific and exam [was] unremarkable." Id. at 1353.

On December 20, 2014, at the hearing before the ALJ, Plaintiff described suffering from constant pain and reduced range of motion in his neck due to spinal stenosis, constant pain in his lower back, reduced range of motion in his left shoulder, numbness in his left hand, pain in both knees due to meniscus tears, seizures, and memory lapses. Id. at 47-53. Plaintiff testified that he had trouble bending at the waist, difficulty walking and using stairs, and that he would experience pain after standing in one place or sitting in a chair for ten to fifteen minutes. Id. at 48-49, 51. Plaintiff testified that he needed to lay down at least once a day for twenty to thirty minutes. Id. at 48-49. Plaintiff stated that he had trouble gripping objects with his left hand, that he could not lift a gallon of milk with his left arm, and that he could not raise his left arm over his head. Id. at 50-51. Plaintiff stated that his seizures began in the 1980's and that he was taking seizure medication, but that there were "a dozen or more" days over the previous year that he had multiple seizures. Id. at 52-53, 73. Plaintiff testified that anxiety and depression cause him problems focusing and constant worry about his activities of daily living, Id. at 51-52.

As to his history of alcohol abuse, Plaintiff testified that he had "gone to detox several times" at Skyline and attended multiple AA meetings each week. Id. at 54. Plaintiff testified that he had been sober since December 30, 2012, other than a "few days" in September 2014. Id. at 54-55. Plaintiff also testified that his anxiety, depression, and seizures continued during periods of sobriety. Id. at 55. Plaintiff testified that he experienced "mild altered mental issues" as a side effect of

gabapentin. Id. at 56. Plaintiff also testified that he did not have health insurance. Id. at 75.

Plaintiff's daughter testified that he had problems with focusing and remembering. Id. at 81. She stated that Plaintiff could not go to the grocery store unaccompanied or manage money. Id. at 81-82. She testified that she did not believe Plaintiff's symptoms related to anxiety, depression, and seizures were exacerbated by alcohol. Id. at 85.

The ALJ asked vocational expert Rebecca Williams whether an individual of Plaintiff's age, education, work experience, and RFC level could perform any jobs that exist in the national economy.[2] Id. at 103-04, 113-14. Based on these limitations, Williams testified that Plaintiff could not perform his prior work activity, but that Plaintiff could perform other jobs that exist in the national economy, such as price marker, mail clerk, and cleaner. Id. at 104-05, 114. Williams answered "Yes" to the ALJ's question "Is your testimony consistent with the Dictionary of Occupational Titles . . . ?" Id. at 116.

On a February 25, 2015 medical source statement, Dr. Gibson found that Plaintiff could: occasionally and frequently lift and carry a maximum of less than ten pounds; and stand, walk, and sit with normal breaks for a maximum of less than two hours during an eight-hour day. Id. at 284. Dr. Gibson found that Plaintiff could sit and stand for five minutes before moving to relieve discomfort, and that Plaintiff must walk around every five minutes for a duration of five minutes. Id. Dr. Gibson found that Plaintiff required the opportunity to shift at will from sitting or standing/walking. Id. Dr. Gibson found that Plaintiff would need to lie down at unpredictable intervals three times during an eight-hour shift. Id. Dr. Gibson also circled answers reflecting that

---

[2]The ALJ adopted this construction of Plaintiff's RFC in the seventh finding of fact and conclusion of law in the decision denying Plaintiff's claims. Id. at 20.

Plaintiff could never crouch or climb ladders and occasionally twist, bend, and climb stairs. Id. at 285. Dr. Gibson noted that these limitations were supported by Plaintiff's x-rays. Id. at 284-85. Based on Plaintiff's EMG, Dr. Gibson found that Plaintiff's bilateral carpal tunnel syndrome affected his ability to reach, finger, push/pull, handle, and feel. Id. at 285. Dr. Gibson found that Plaintiff's symptoms were frequently severe enough to interfere with attention and concentration required to perform simple work-related tasks. Id. Dr. Gibson estimated that Plaintiff's physical impairments would cause him to be absent from work about four days per month. Id.

As to Plaintiff's mental abilities, Dr. Gibson noted that Plaintiff was diagnosed with depression and history of alcoholism, including symptoms of flat affect and apathy. Id. at 287. Dr. Gibson checked boxes reflecting that Plaintiff experienced: anhedonia or pervasive loss of interest in almost all activities; decreased energy; difficulty concentrating or thinking; and feelings of guilt or worthlessness. Id. Dr. Gibson found that Plaintiff experienced hostility and irritability and had generalized persistent anxiety, including motor tension. Id. Dr. Gibson found that Plaintiff had mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, mild deficiencies in concentration, persistence, or pace, and mild episodes of deterioration or decompensation in work settings. Id. at 289. Dr. Gibson found that Plaintiff's psychiatric condition exacerbated Plaintiff's physical symptoms. Id. Dr. Gibson estimated that Plaintiff's mental impairments would cause him to be absent from work more than four days per month. Id. at 289.

### B. Conclusions of Law

The Social Security Act defines "disability" as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. § 423(d)(1); see also 42 U.S.C. § 1382c(a)(3). A reviewing court's evaluation of the Commissioner's decision is based upon the entire record made from the administrative hearing process. Jones v. Sec'y, Health and Human Servs., 945 F.2d 1365, 1369 (6th Cir. 1991). Judicial review is limited to a determination of (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Sec'y of Health and Human Servs., 803 F.2d 211, 213 (6th Cir. 1986). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quoting Cutlip v. Sec'y of Health and Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389-90 (6th Cir. 1999) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).

Plaintiff argues that his claim should be remanded for three reasons: (1) the Appeals Council improperly found that Dr. Gibson's medical source statements obtained after Plaintiff's hearing with the ALJ were not "new and material" evidence; (2) VE testimony on which the ALJ relied conflicts with the Dictionary of Occupational Titles ("DOT") and Selected Characteristics of Occupations ("SCO"); and (3) the ALJ improperly found that Plaintiff does not have severe mental impairments in the absence of substance abuse and failed to include mental limitations in Plaintiff's RFC. (Docket Entry No. 19 at 3).

Plaintiff's argument that Dr. Gibson's medical source statements warrant remand is essentially two-fold: first, that the Appeals Council failed to adequately explain why the statements

23

were not "new and material," and second, that this Court should remand regardless of procedural deficiencies by the Appeals Council because Dr. Gibson's statements are new, material, and there was good cause for not presenting them to the ALJ. The Court disagrees on both points.

Plaintiff first asserts that the Appeals Council contravened section I-3-3-5 of the Social Security Administration's Hearings, Appeals, and Litigation Law Manual ("HALLEX") by failing to explain why Dr. Gibson's statements warranted denying Plaintiff's request for review despite admitting the statements into evidence. (Docket Entry No. 19 at 4-5).[3] HALLEX § I-3-5-1 provides: "When the Appeals Council denies a request for review . . . the Appeals Council will specifically address additional evidence or contentions submitted in connection with the request for review." HALLEX § I-3-3-6 states that the Appeals Council must evaluate additional evidence that is "new, material, and relates to the period on or before the date of the ALJ decision."

Here, the Court interprets the Appeal's Council's notice of denial as a denial of Plaintiff's request for review even after considering Dr. Gibson's statements as part of the record. See Marks v. Colvin, No. 2:15-cv-0550, 2016 WL 233177, at *5 (S.D. Ohio Jan. 20, 2016) (finding that an Appeals Council's denial of request for review considered evidence new, material, and related to the period in question where the Appeals Council did not affirmatively state otherwise, explicitly made the evidence part of the record, and did not affirmatively state that it did not consider the evidence in deciding whether to grant review of the ALJ's decision), adopted by, 2016 WL 814982 (S.D. Ohio Mar. 2, 2016). HALLEX § I-3-5-20 establishes three specific requirements where a claimant submits additional evidence that is new, material, and relates to the period at issue, but does not provide a

[3]On March 3, 2015, Plaintiff requested review of the ALJ's adverse ruling from the Appeals Council. (Docket Entry No. 14 at 9). Plaintiff submitted additional evidence with his request, including Dr. Gibson's medical source statements dated February 25, 2015. Id. at 6.

basis for granting review. In such circumstances, the Appeals Council analyst must: (1) prepare a denial notice; (2) include language in the denial notice specifically identifying the evidence and explaining the evidence did not provide a basis for granting review under the "weight of the evidence" standard; and (3) exhibit the evidence and prepare an exhibit list with the accompanying order.

The Court concludes that the Appeals Council satisfied the requirements of HALLEX § I-3-5-20. The Appeals Council prepared a denial notice of Plaintiff's request for review, (Docket Entry No. 14 at 1-4), and an exhibit list of the additional evidence with the accompanying order, id. at 6. Although the denial notice did not mention Dr. Gibson's statements by name, the notice stated that the Appeals Council "considered . . . the additional evidence listed on the enclosed Order of Appeals." Id. at 1. This direct reference to an enclosed order that lists Dr. Gibson's statements as exhibits is sufficient to "specifically identify" them as evidence. Further, the notice explained that the weight of the evidence, including this additional evidence, "d[id] not provide a basis for changing the Administrative Law Judge's decision." Id. at 1-2. As another district court within this circuit held, "the Appeals Council is not required to make specific findings in its decision when it denies a request for review." Graley v. Colvin, No. 1:14-CV-00728, 2015 WL 3935953, at *14 (N.D. Ohio June 26, 2015) (citing Parks ex rel. D.P. v. Comm'r, Soc. Sec. Admin., 783 F.3d 847, 852 (11th Cir. 2015)). Thus, the Court concludes that the Appeals Council's explanation of its denial of Plaintiff's request for review does not warrant remand.

Next, under sentence six of 42 U.S.C. § 405(g), additional evidence may warrant remand where a plaintiff demonstrates that the evidence is "new evidence which is material and that there is good cause" for not presenting it in the prior proceeding. 42 U.S.C. § 405(g); see also Foster v.

Halter, 279 F.3d 348, 357 (6th Cir. 2001). The plaintiff bears the burden of showing that remand is

appropriate. See Foster, 279 F.3d at 357 (citing Oliver v. Sec'y of Health & Human Servs., 803 F.2d

211, 214 (6th Cir. 1984)). Here, Plaintiff has not explicitly requested a sentence six remand, but

argues that Dr. Gibson's statements meet the requirements for remand by reference to a Sixth Circuit

case applying the statute. (See Docket Entry No. 19 at 6 (citing Cline v. Comm'r of Soc. Sec., 96

F.3d 146, 148 (6th Cir. 1996)). The Commissioner does not dispute that Dr. Gibson's statements are

"new," but argues that they are not "material" and that there was not "good cause" for Plaintiff's

failure to present them to the ALJ. (Docket Entry No. 20 at 9-10). Because the Court concludes that

Plaintiff has not carried his burden of demonstrating that there was good cause for failing to present

Dr. Gibson's statements to the ALJ, it is unnecessary to address the issue of materiality.

The Sixth Circuit takes a "hard line" on the "good cause" inquiry. See Oliver, 804 F.2d at

965 (citing Willis v. Sec'y of Health and Human Servs., 727 F.2d 551, 554 (6th Cir. 1984)). The

Sixth Circuit defines "good cause" as "a reasonable justification for the failure to acquire and present

the evidence for inclusion in the hearing before the ALJ." Foster, 279 F.3d at 357 (citing Willis, 727

F.2d at 554). Plaintiff states that "the most obvious explanation" for his failure to submit Dr.

Gibson's statements to the ALJ is that "this evidence, previously requested, was not provided by Dr.

Gibson in time to present it to the ALJ." (Docket Entry No. 19 at 8). Plaintiff also notes that Dr.

Gibson was on hiatus for "some portion of the time prior to [Plaintiff's] hearing." Id.

That evidence was requested evidence prior to a hearing is not necessarily a "reasonable

justification" for a claimant's failure to present it to the ALJ. See Cranfield v. Comm'r, Soc. Sec.,

79 Fed.Appx. 852, 859 (6th Cir. 2003) (finding the fact that a claimant's doctors did not complete

reports until after the ALJ's decision insufficient to establish "good cause" where the claimant did

not alert the ALJ that reports were forthcoming). Neither Plaintiff nor Plaintiff's representative informed the ALJ at the hearing that medical source statements from Dr. Gibson would be forthcoming, or requested that the ALJ hold the record open for that purpose. See Bass v. McMahon, 499 F.3d 506, 513 (6th Cir. 2007) (citing Curry v. Sec'y of Health and Human Servs., No. 87-1779, 1988 WL 89340, at *4 (6th Cir. Aug. 29, 1988) ("[P]laintiff's counsel did not seek to have the record remain open to submit the evidence here provided, which in and of itself shows a lack of good cause.")). Thus, Dr. Gibson's statements do not warrant remand under sentence six of 42 U.S.C. § 405(g) and the Court cannot consider this evidence in addressing Plaintiff's remaining arguments. See Cline, 96 F.3d at 148 ("[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision.").

Plaintiff next contends that the ALJ failed to obtain a reasonable explanation from the VE on conflicts between the VE's testimony and the DOT/SCO as required by SSR 00-4p. (Docket Entry No. 19 at 10). The VE testified that Plaintiff could work as a price marker, mail clerk, and cleaner, based on the RFC provided by the ALJ. (Docket Entry No. 14 at 105, 114). Plaintiff specifically argues that "none of these jobs can be performed based upon their descriptions in the DOT/SCO given the ALJ's finding that [Plaintiff] can only occasionally use his left hand for manipulation, can never reach overhead with his left hand, and only occasionally reach in other directions with his left hand." (Docket Entry No. 19 at 10 (emphasis omitted)).

SSR 00-4p states: "When a VE . . . provides evidence about the requirements of a job or occupation, the [ALJ] has an affirmative responsibility to ask about any possible conflict between

that VE or VS evidence and information provided in the DOT." Here, the ALJ asked the VE whether her testimony was consistent with the DOT, and the VE answered "yes." (Docket Entry No. 14 at 116). Neither Plaintiff nor Plaintiff's representative objected to the VE's answer or identified any potential conflicts at the hearing. In these circumstances, the ALJ is not required to question the VE further. See Lindsley v. Comm'r of Soc. Sec., 560 F.3d 601, 606 (6th Cir. 2009) (citing Martin v. Comm'r of Soc. Sec., 170 Fed.Appx. 369, 374 (6th Cir. 2006)). Thus, the Court concludes that the ALJ's reliance on the VE's testimony was not improper and Plaintiff's contention lacks merit.

Plaintiff next argues that the ALJ improperly evaluated his mental limitations in the absence of substance abuse. (Docket Entry No. 19 at 12-20). SSA regulations provide that Plaintiff is entitled to benefits only if his impairments would be disabling in the absence of substance abuse. See 20 C.F.R. § 404.1535(b)(2)(ii). Here, the ALJ first determined that, considering Plaintiff's alcohol use, Plaintiff was disabled due to a "severe combination of mental impairments" that included anxiety, depression, and alcohol dependence. See id. § 404.1535(a); (Docket Entry No. 14 at 16-17). The ALJ then determined that Plaintiff would not be disabled if he stopped the substance abuse. Id. at 26-27. The ALJ found that, although Plaintiff would continue to have some severe physical impairments, he "would not continue to have a severe mental impairment" because "the remaining limitations would not cause more than a minimal impact on [his] ability to perform basic work activities." Id. at 18. Plaintiff argues that the ALJ erred in finding that Plaintiff's mental impairments were "non-severe" in the absence of substance abuse and failing to include mental limitations in Plaintiff's RFC. (Docket Entry No. 19 at 12).

"An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(a). SSR

85-28 provides that "great care should be exercised in applying the not severe impairment concept" and explains the process for determining that an impairment is not severe: "A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its (their) limiting effects on the individual's physical and mental ability(ies) to perform basic work activities . . . ." Basic work activities include: "understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting." 20 C.F.R. § 416.921(b)(3)-(6).

Even if the ALJ wrongly decided that Plaintiff's mental impairments were "non-severe," this conclusion by itself is not grounds for remand because the ALJ determined that Plaintiff suffered from other severe impairments and continued the disability determination process. See Maziarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987) (holding that it is not reversible error where an ALJ fails to find that an impairment is severe as long as the ALJ considers all of a claimant's impairments in an ensuing disability determination). Thus, remand is only appropriate if substantial evidence does not support the ALJ's decision to omit mental restrictions from Plaintiff's RFC in the absence of substance abuse.

Plaintiff argues that his "mental impairments exist even during periods of sobriety and even in a structured setting, and result in functional limitations which were not addressed by the ALJ's findings." (Docket Entry No. 19 at 17). The Court concludes that there is substantial evidence supporting both the ALJ's finding and Plaintiff's contention. Thus, the Court upholds the Commissioner's determination that the ALJ properly assessed Plaintiff with no mental limitations in the absence of substance abuse, as required where there is substantial evidence on both sides. Her,

203 F.3d at 389.

The ALJ found that Plaintiff "does well with remission from alcohol and has no more than mild limitation in any area." (Docket Entry No. 14 at 20). The ALJ considered the opinion of state consultative examiner Dr. Doran, completed when Plaintiff had been abstaining from alcohol for approximately two months. (Docket Entry No. 14 at 18). The ALJ noted that Dr. Doran diagnosed Plaintiff with anxiety disorder and assessed Plaintiff with "mild limitations." Id. There, the ALJ cites to Dr. Doran's findings that Plaintiff had mild limitations in understanding and remembering, sustaining concentration and persistence, interacting with others, and adapting to changes. Id.

The ALJ also considered the opinions of Dr. Schoup, who reviewed Plaintiff's medical records as part of Plaintiff's initial disability determination, and Dr. Stanley, who reviewed Plaintiff's medical records as part of Plaintiff's request for reconsideration. Id. at 19. Drs. Schoup and Stanley ("the non-examining consultants") concluded that Plaintiff's severe impairments included anxiety disorder and found that: Plaintiff had moderate limitations in activities of daily living; Plaintiff had mild limitations in social functioning and concentration, persistence or pace; and there was insufficient evidence to determine if Plaintiff suffered from episodes of decompensation. Id. at 123, 138-39. Although the non-examining consultants found that Dr. Doran's assessment should be given "significant weight" because it is "the only mental assessment absent" alcohol, they also opined that Plaintiff's history suggested "somewhat greater adaptive limitations." Id. at 124, 139.

The ALJ gave greater weight to Dr. Doran's opinion than the non-examining consultants' opinion:

I give some weight to the opinions of [the non-examining consultants], but no weight

to their assertion that the claimant has adaptation limitations. I give greater weight
to the opinion of [Dr. Doran] who had the benefit of examining the claimant at a time
when he was not actively abusing alcohol and whose opinion is generally consistent
with other mental status examinations of the claimant and his functional abilities
during periods of non-use.

Id. at 19-20.

SSA regulations provide that an ALJ will "[g]enerally . . . give more weight to the opinion

of a source who has examined [the claimant] than to the opinion of a source who has not examined

[the claimant]." 20 C.F.R. § 404.1527(c)(1). Other factors relevant to weighing opinion evidence

from non-treating sources include: whether the medical source provided evidence supporting the

opinion, consistency with the record as a whole, specialization, and other factors. Id. §

404.1527(c)(3)-(6). Further, the ALJ is permitted "to look at [Plaintiff's] periods of sobriety and

compare those periods to times when the claimant was abusing substances . . . ." Monateri v.

Comm'r of Soc. Sec., 436 Fed.Appx. 434, 443 (6th Cir. 2011) (citing Bartley v. Barnhart, 117

Fed.Appx. 993, 998 (6th Cir. 2004)).

Here, the ALJ found that Dr. Doran's opinion was consistent with the record as a whole by

comparing it to "other mental status examinations of the [Plaintiff] . . . during periods of non-use."

(Docket Entry No. 14 at 19-20); see 20 C.F.R. § 404.1527(c)(4). Plaintiff is correct that "[t]he ALJ

did not identify these other examinations." (Docket Entry No. 19 at 16). Yet, the structure of the

ALJ's decision reflects that the ALJ was referring to mental status examinations performed at

discharge after Plaintiff's "multiple hospitalizations for alcohol intoxication, alcoholism and

continuous drinking behavior." (Docket Entry No. 14 at 18). The ALJ considered these

examinations:

The claimant has gone through detox from alcohol on more than one occasion with

mental status examinations at discharge showing the claimant fully oriented, memory intact and thought process, attention span and concentration within normal limits. The claimant denied hallucinations and delusions. He denied suicidal and homicidal ideation.

Id. at 18 (citing to discharge mental status examinations on April 24, 2010; May 20, 2010; July 10, 2010; August 9, 2010; October 28, 2010; February 2, 2011; February 26, 2011; May 19, 2011; July 25, 2012; October 11, 2012; November 7, 2012; and October 8, 2014). These examinations were performed when Plaintiff was no longer acutely intoxicated, and thus provide some insight into Plaintiff's mental functioning in the absence of substance abuse.

Plaintiff also argues that the ALJ misquoted a treatment note from his treating physician, Dr. Gibson. (Docket Entry No. 19 at 16-17). The ALJ stated that Dr. Gibson "did not think 'any of [Plaintiff's] alcohol consumption is drive [sic] by self-medication for depression . . . .'" (Docket Entry No. 14 at 17 (quoting Dr. Gibson's treatment note from Plaintiff's January 28, 2011 office visit)). This quote is taken from the section titled "Assessment/Plan" regarding Plaintiff's chronic history of alcoholism. Id. at 1244. The full quote is:

> I really don't know what else to offer in [Plaintiff's] treatment of alcoholism since [he] has failed just about every referral or suggestion I and social workers have provided him during his many hospitalizations for intoxication. I do think that if any of his alcohol consumption is driven by self medication for depression, the treatment of his depression may serve as a modest deterrent to drinking.

Id. (emphasis added). The Court agrees with Plaintiff that the ALJ's partial quotation does not accurately reflect Dr. Gibson's statement. Yet, Dr. Gibson's statement is purely speculative, and thus does not alter the Court's conclusion that there is substantial evidence in the record as a whole supporting the ALJ's decision to omit mental restrictions from Plaintiff's RFC in the absence of substance abuse.

Further, the ALJ performed a "paragraph B" mental function analysis of Plaintiff in the absence of substance abuse and found that Plaintiff would have no episodes of decompensation and only mild limitations in the areas of activities of daily living, social functioning, and concentration, persistence or pace. (Docket Entry No. 14 at 18-19).[4] Regarding activities of daily living, the ALJ summarized Plaintiff's description of his activities to Dr. Doran in August 2013, when Plaintiff had been abstaining from alcohol for approximately two months. Id. at 18-19. Plaintiff argues that the ALJ did not include in his summary all of Dr. Doran's notes, including Plaintiff's statement that "on his worst days he 'has dark depression, he is discontent, he is lonely, he is miserable, and he is hopeless.'" (Docket Entry No. 19 at 18). Dr. Doran nonetheless concluded that Plaintiff had only mild mental limitations based on all of Plaintiff's statements, and the ALJ properly gave Dr. Doran's opinion significant weight.

Plaintiff also contends that the ALJ ignored hearing testimony by Plaintiff and Plaintiff's daughter in his evaluation of Plaintiff's mental limitations. Id. Yet, the ALJ stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistence with the objective medical evidence and other evidence . . . ." (Docket Entry No. 14 at 20). Plaintiff is correct that the ALJ did not reproduce all of the hearing testimony in his decision, including Plaintiff's daughter's testimony regarding Plaintiff's mental functioning. Some of this testimony may constitute substantial evidence supporting Plaintiff's argument that the ALJ should have included mental limitations in his RFC. The testimony actually discussed by the ALJ, however,

---

[4] The ALJ acknowledged that "[t]he limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment," but incorporated his "paragraph B" findings into the RFC assessment by that stating that his analysis of the evidence "accurately reflects [Plaintiff's] functioning without active substance use." (Docket Entry No. 14 at 19).

is also substantial evidence supporting his decision that Plaintiff does not have mental limitations in his RFC in the absence of substance abuse. At the time of the hearing, Plaintiff had been abstaining from alcohol for approximately three months. The ALJ noted Plaintiff's testimony that he had a part-time job, took "several city buses to get to work from the halfway house where he lives," was not prescribed medication to treat anxiety or depression, and "perform[ed] two highly skilled jobs for many years when not drinking." Id. at 19.

In sum, Plaintiff's first two contentions are without merit. As to the ALJ's RFC assessment of Plaintiff's mental limitations in the absence of substance abuse, the Court concludes that there is substantial evidence supporting both the Commissioner's decision and the Plaintiff's position. Thus, the Court is obliged to affirm to Commissioner's decision. See McClanahan v. Comm'r of Soc. Sec., 474 F.3d 830, 833 (6th Cir. 2006) (quoting Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.").

An appropriate Order is filed herewith.

**ENTERED** this the 5 day of July, 2016.

WILLIAM J. HAYNES, JR.
Senior United States District Judge